UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Thomas R. WOODSON,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>R.N. ORTIZ, et al.,<br><br>　　　　　　　　　Defendants. | Case No.: 15-cv-1285-WQH-AGS<br><br>**REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' SUMMARY JUDGMENT MOTION**<br>**(ECF No. 48)** |

Plaintiff fell in his prison cell and broke his hand. He later sued the defendants—four members of the prison medical staff—for delaying his treatment and other misdeeds, which he says caused him permanent injury. But the undisputed medical evidence establishes that any treatment delays had no effect on plaintiff's post-surgical outcome. Regardless, as to three defendants, the evidence is entirely lacking. And the final defendant has qualified immunity. Defendants are, therefore, entitled to summary judgment.

## **BACKGROUND**

On May 27, 2014, plaintiff Thomas Woodson, an inmate at Calipatria State Prison, fell from his cell bunk and fractured his left thumb. (*See* Compl., ECF No. 1, at 4; ECF No. 48-4, at 24, 33.) Two days later, the triage nurse—defendant Ortiz—received and initialed three urgent medical-request forms about the injury. (ECF No. 48-4, at 21-23.)

## A. The First Week After the May 27, 2014 Injury—Nurse Ortiz's Response

The parties dispute what happened after May 29, when nurse Ortiz learned of Woodson's medical requests. According to the hospital records and nurse Ortiz, she promptly scheduled a face-to-face clinic appointment with Woodson for the next day. (ECF No. 48-4, at 24; Ortiz Decl., ECF No. 48-8, at 2.) At that May 30 clinic visit, she examined Woodson, "urgently referred" him for further assessment, and ensured that he was seen by a doctor within an hour. (ECF No. 48-4, at 24-28; Ortiz Decl., ECF No. 48-8, at 2.) Ortiz had no further treatment role, but the doctor immediately obtained and reviewed an X-ray. (ECF No. 48-4, at 26, 30, 35; Ortiz Decl., ECF No. 48-8, at 2.) That same day the doctor prescribed a thumb splint and Tylenol with codeine, and recommended Woodson for an "urgent" orthopedic consultation. (ECF No. 48-4, at 26-29, 31, 33.)

Woodson, on the other hand, swears that he "did not see <u>anyone</u> until June 3, 2014," when he says Ortiz conducted his "initial assessment" and referred him to the doctor who ordered the X-rays. (Pl. Resp., ECF No. 53, at 2-3.) Luckily, Woodson already had an existing three-month prescription for the anti-inflammatory pain medication Naproxen. (ECF No. 48-4, at 28, 33-34; *see also id*. at 24, 26.)

## B. Month-Long Wait for Surgery

In either event, on June 5, 2014, Woodson had his initial consultation with the orthopedic surgeon, who reviewed the X-rays and recommended surgery. (ECF No. 48-4, at 35-36, 38.) The surgeon cautioned Woodson, however, that the planned surgical repair would "not give a normal thumb" and that he would have "reduced range of motion . . . permanently." (*Id*. at 36.)

The following day, defendant Dr. Kim had his only interaction with Woodson, at a follow-up visit. Dr. Kim placed Woodson on temporary limited duty and ordered "Bottom Bunk" and "No left hand use" accommodations. (ECF No. 48-4, at 40-41; Kim Decl., ECF No. 48-7, at 2.) On the top of the form, he handwrote "Time Sensitive." (ECF No. 48-4, at 40; Kim Decl., ECF No. 48-7, at 2.)

On Monday, June 9, 2014, another defendant, Dr. Stepke, completed the surgery-request paperwork. (ECF No. 48-4, at 42.) Consistent with the surgeon's written evaluation, Dr. Stepke recommended that the surgery be scheduled in a "Routine" timeframe (meaning "within 90 days"), but he handwrote "ASAP" next to that. (ECF No. 48-4, at 42; Stepke Decl., ECF No. 48-6, at 2-3, 3 n.3.) Within days of Woodson's signing the necessary consent form, the scheduling nurse—defendant Orduño[1]—calendared the surgery for July 11, 2014, which was the surgeon's first available date. (ECF No. 1, at 39; Orduño Decl., ECF No. 48-9, at 2.)

## C. Prognosis of Permanent Joint Impairment

Although Woodson was warned that the July 11, 2014 surgery would not restore his thumb to normal (*see* ECF No. 48-4, at 36), he was still unhappy with his recovery and "blam[ed] his results on the delay of surgery." (ECF No. 48-4, at 61.) In the surgeon's expert opinion, however, the "surgery date had no effect on the efficacy of the surgery or the post-surgical outcome." (Foerster Decl., ECF No. 48-5, at 3; *see also* ECF No. 48-4, at 61 (surgeon "thought that [Woodson's] function is actually to be expected whether or not the surgery was delayed. . . ."); *cf.* Foerster Decl., ECF No. 48-5, at 6 ("The post-surgical results were as expected for this sort of injury, and consistent with repeated pre- and post-surgical discussions with the patient.").)

Woodson's thumb never fully recovered, so he sued the prison medical staff under 42 U.S.C. § 1983 for delaying his care and being deliberately indifferent to his medical needs. Defendants move for summary judgment on the grounds that no reasonable jury could find in Woodson's favor and that they each have qualified immunity.

---

[1] Although listed in the complaint as "Orduna" (Cmpl., ECF No. 1, at 1), apparently this defendant's last name is actually spelled "Orduño." (Orduño Decl., ECF No. 48-9, at 2.) The Court will uniformly refer to her as Orduño.

# DISCUSSION

## A. Summary Judgment Standard

When reviewing a summary judgment motion, the Court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party," and may only grant it after concluding "there are no genuine issues of material fact." *Lowry v. City of San Diego*, 858 F.3d 1248, 1254 (9th Cir. 2017). The only requirement "to defeat summary judgment is simply evidence such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017) (citation omitted). When evidence is "genuinely disputed on a particular issue—such as by conflicting testimony—the issue is inappropriate for resolution on summary judgment." *Id.* (citation omitted).

## B. Deliberate Indifference

For inadequate medical care to reach constitutional dimensions, the prisoner must prove two elements: (1) "the existence of a serious medical need," that is, a condition that left untreated "'could result in further significant injury' or cause 'the unnecessary and wanton infliction of pain'"; and (2) the prison official's "deliberate indifference" to that need. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citations omitted).

Because defendants do not dispute that a broken hand is a "serious medical need," the only issue is the second element. Deliberate indifference is a formidable standard, akin to criminal recklessness: the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837, 839-40 (1994). "[I]solated occurrences of neglect," as well as "mere malpractice, or even gross negligence," may be inexcusable, but they do not amount to deliberate indifference. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (citation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The plaintiff "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances'

4

and that the defendants 'chose this course in conscious disregard of an excessive risk to the plaintiff's health.'" *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (citations omitted).

### 1. *Delay of Medical Care*

(a) *First Delay—One Week Until Initial Treatment*

Woodson contends that the initial weeklong delay—from when he broke his hand to the day medical staff first saw him—constituted deliberate indifference. While he could arguably make that case against defendant Ortiz, as discussed below, there is no evidence that defendants Orduño, Dr. Kim, or Dr. Stepke knew of or were in any way responsible for this delay. Thus, these three defendants are entitled to summary judgment on this basis of liability. *See Fairley v. Shelton*, 664 F. App'x 616, 617 (9th Cir. 2016) (affirming summary judgment because the prisoner "failed to raise a genuine dispute of material fact as to whether these defendants were personally involved in a constitutional violation or whether their conduct caused any such violation.").

Nurse Ortiz, on the other hand, was involved in Woodson's initial medical scheduling. On May 29, 2014, Ortiz learned that Woodson had been suffering with a broken hand for two days. Although she claims that she promptly scheduled him for the clinic and saw him the very next day—a claim supported by multiple medical records, notes, and other sources—Woodson swore under penalty of perjury that Ortiz first saw him on June 3. For summary judgment purposes, the Court must draw "all inferences in favor of" Woodson and thus must accept his testimony on this disputed point. *See Fuller*, 865 F.3d at 1161. So, at this stage, the Court must presume that on May 29 Ortiz discovered that Woodson had a two-day-old injury, yet waited five more days to treat him.

Typically, "delay in providing a prisoner" with medical care, "standing alone, does not constitute an eighth amendment violation." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). Medical delay supports a constitutional claim only if it "was harmful." *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (citation omitted). Woodson's records certainly show he was in significant discomfort. At the initial

5

appointment with Ortiz, Woodson described his pain as an 8 out of 10. (ECF No. 48-4, at 24.) And the treating doctor apparently agreed, immediately prescribing a splint and Tylenol with codeine, even though Woodson was already on Naproxen. (Cmpl., ECF No. 1, at 5; ECF No. 48-4, at 26, 28, 31, 33-34.) Thus, drawing all inferences in Woodson's favor, this Court concludes that a reasonable jury could find that Ortiz's delay in providing Woodson care amounted to deliberate indifference. But Ortiz may still have qualified immunity, a subject addressed at the end of this opinion.

(b) *Second Delay—Month-Long Wait for Surgery*

Next, Woodson complains of the delay between the June 5, 2014 referral for surgery and the July 11, 2014 surgery itself. There is no evidence, however, that defendants Ortiz or Dr. Kim had any involvement with the surgery's timing, so they should receive summary judgment on all claims arising from this second delay. *See Fairley*, 664 F. App'x at 617.

The other two defendants—Dr. Stepke and nurse Orduño—helped schedule Woodson's surgery, but there are many obstacles to finding that any surgery-related delay was unconstitutional. First, Woodson has not shown that his surgery was in fact delayed. The surgery took place 36 days after the referral, on "the first date that [the surgeon's] office had available," which was "well within the 90-day window for a routine surgery." (Orduño Decl., ECF No. 48-9, at 2.) While he awaited his operation, Woodson continued to receive medication and care. (*See* ECF No. 48-4, at 33, 43.) It is difficult to imagine how this "course of treatment" could be deemed "medically unacceptable under the circumstances." *See Hamby*, 821 F.3d at 1092 (citation omitted).

Second, even assuming a 36-day wait was medically unacceptable, Dr. Stepke and nurse Orduño can hardly be faulted for the surgeon's busy calendar. Woodson received the first available date. He argues, however, that defendants should have emphasized the seriousness of his condition. In the surgery order's scheduling section, Dr. Stepke circled "routine," which requires action "within 90 days," and he handwrote "ASAP" next to that. (Stepke Decl., ECF No. 48-6, at 2-3, 3 n.3.) Woodson criticizes him for not instead circling "urgent" or "emergent"—categories requiring action within "14 days" or "4 hours,"

6

respectively. (*See* Pl. Resp., ECF No. 53, at 4; Stepke Decl., ECF No. 48-6, at 2-3 n.3.) Also, Woodson recalls that at the initial consultation, the surgeon verbally recommended "immediate" surgery. (Pl. Resp., ECF No. 53, at 12.) The surgeon denies this, swearing instead that the "scheduled surgery date was medically reasonable and appropriate." (*See* Foerster Decl., ECF No. 48-5, at 3.) But even if the surgeon had supported immediate surgery, there is no evidence that Dr. Stepke knew that. So, he could not have been deliberately indifferent to such contrary advice. Regardless, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Hamby*, 821 F.3d at 1092 (citation omitted).

A third problem is that Woodson has not shown that his surgery's timing impaired his long-term recovery. "[M]ere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference . . . unless the denial was harmful." *Shapley*, 766 F.2d at 407 (citation omitted). The only medical evidence on this point affirms that the waiting period had no effect. Specifically, the operating surgeon—who is a witness and not a defendant—declared under penalty of perjury that the "surgery date had no effect on the efficacy of the surgery or the post-surgical outcome." (Foerster Decl., ECF No. 48-5, at 3; *see also id.* at 6 ("The post-surgical results were as expected for this sort of injury, and consistent with repeated pre- and post-surgical discussions with the patient."); ECF No. 48-4, at 61 (Woodson's six-month post-operative "function is actually to be expected whether or not the surgery was delayed. . . .").).

Finally, even assuming the wait was harmful, nurse Orduño does not appear to bear any responsibility for it. Dr. Stepke asked her to schedule this "routine" surgery "ASAP," and Orduño dutifully secured the next available date on the surgeon's calendar. In other words, she did exactly as ordered. She can hardly be blamed for failing to countermand the treating doctor's instructions, especially when she had never seen the injury herself. No evidence suggests that Orduño was negligent, let alone reckless enough to qualify as deliberately indifferent.

7

In short, there is no evidence that defendants' course of treatment "was medically unacceptable under the circumstances," nor that any defendant "chose this course in conscious disregard of an excessive risk to plaintiff's health." *See Colwell*, 763 F.3d at 1068 (citation omitted). Summary judgment is therefore proper for all defendants as to any claims regarding delay in scheduling Woodson's surgery.

### 2. *Rudeness and Failing to Inform*

In his complaint, Woodson compiles a hodgepodge of other deliberate-indifference theories. Most of these allegations fall under the rubric of rudeness: nurse Ortiz was "agitated" and "rolled her eyes and sucked her teeth" (Compl., ECF No. 1, at 4); Dr. Kim "did not seem in the least bit interested" and "stoically dismissed plaintiff without an adequate response" (*id*. at 6); Dr. Stepke "shrugged his shoulders with apathy" (*id*. at 7). Also, he claims that Dr. Kim "refused to provide plaintiff with information pertaining to scheduling or [the] waiting period for off-site treatment." (*Id*. at 2.) But the Constitution does not compel prison medical staff to be informative or polite; they must simply provide the minimum care required by the Eighth and Fourteenth Amendments. *See Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 849 (6th Cir. 2016) ("Plaintiffs' allegations that Defendants made rude or critical comments, offered unhelpful suggestions, and acted disrespectfully do not undercut the reasonableness of Defendants' concrete actions taken in response to Plaintiffs' complaints."); *Alcon v. Bright*, No. C14-01927 SI (pr), 2016 WL 795489, at *9 (N.D. Cal. Mar. 1, 2016) ("[R]udeness is not the same thing as deliberate indifference."). So, these accusations are not a basis for relief.

### 3. *Falsifying Medical Records*

Finally, Woodson charges Dr. Kim with falsifying medical documents. (Cmpl., ECF No. 1, at 2, 11.) Although many hospital records show that Woodson was X-rayed on May 30, 2014, he maintains that he had no medical procedures or examinations until June 3. (*Compare, e.g., id*. at 19, 69-70 (reports) *with id*. at 11 (Woodson's allegations).) He accuses Dr. Kim of falsely reporting the earlier X-ray date on a notification form (*see id*. at 11), but he offers no evidence that this alleged error denied or delayed his medical care.

8

Similarly, he complains that the X-ray report itself falsely noted: "No definite fracture is identified." (*Id.* at 11, 70.) But it appears that the report was written by a radiologist, not Dr. Kim, and Dr. Kim is merely listed as the "Referring Physician." (*See id.* at 70.) At any rate, it is not clear how this statement delayed or denied Woodson any treatment. Woodson was promptly referred to an orthopedic specialist, who reviewed the X-rays himself on June 5, 2014, and found that "in my opinion these [X-rays] showed a fracture." (*See* ECF No. 48-5, at 2.) The surgeon then recommended surgery. (*Id.*)

Indeed, Woodson does not dispute Dr. Kim's declaration that he had no "role in scheduling [Woodson's] off-site surgery . . . or control over the schedules or actions of off-site medical providers." (Kim Decl., ECF No. 48-7, at 2.) And Dr. Kim's undisputed actions suggest anything but indifference. Dr. Kim personally saw Woodson only once, on June 6, 2014, after his first surgical consultation. Although Woodson already had a splint and pain medication—and apparently without any request from the primary care physician Dr. Stepke—Dr. Kim ordered that Woodson receive limited duty status, a bottom-bunk permit, and a "No left hand use" accommodation. (*See id.*) Plus, he marked these orders "Time Sensitive" to ensure they were put into effect quickly. (*Id.*) Nothing suggests Dr. Kim was deliberately indifferent.

## C. Qualified Immunity

As discussed above, in the light most favorable to Woodson, he could sustain his deliberate-indifference case against only one defendant—Ortiz—for her alleged five-day delay in treating him. But the analysis doesn't end there; Ortiz may be immune from suit.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, ___ U.S. ___, 135 S. Ct. 2042, 2044 (2015) (citation omitted). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (citation omitted). The plaintiff need not have "a case directly on point" to obtain relief, but existing Supreme Court precedent or a "robust consensus of cases of persuasive

9

authority" must "have placed the statutory or constitutional question beyond debate." *Id.* (citations omitted).

The treatment-delay case law in the Ninth Circuit is, at best, mixed. Many courts have found no deliberate indifference for delays that were similar or longer than the one here. *See, e.g.*, *Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998) ("alleged delays in administering [plaintiff's] pain medication, in treating his broken nose, and in providing him with a replacement crutch" were not deliberate indifference); *Wood v. Housewright*, 900 F.2d 1332, 1333. 1335 (9th Cir. 1990) ("several days" of delay after inmate "broke one of the pins in his shoulder" was not deliberate indifference); *Carr v. Cal. Dep't of Corr.*, No. 14-cv-02074-LJO-BAM (PC), 2016 WL 6648639, at *3 (E.D. Cal. Nov. 9, 2016) (23-day delay in "receiving pain medication and treatment for a broken rib" was not deliberate indifference); *Lambert v. Soto*, No. 10cv1976-AJB (BLM), 2012 WL 5878503, at *5-6 (S.D. Cal. Sept. 21, 2012) (16-day delay in treating plaintiff's "swelling and bleeding," "serious injuries to [plaintiff's] back," "difficulty breathing," "a dislocated shoulder," and an inability "to bear any weight on his leg due to a severe knee sprain" was not deliberate indifference); *Cammon v. Washington Cty. Jail*, No. 12-cv-00339-MO, 2012 WL 1758622, at *2 (D. Or. May 15, 2012) (three-and-a-half-day delay until first examination of broken thumb was not deliberate indifference); *cf. Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970) (11-day delay before surgery on "serious facial bone fractures" was not deliberate indifference). Also, Woodson's access to prescribed painkillers—at a minimum, Naproxen (ECF No. 48-4, at 28, 33-34; *see also id.* at 24, 26)—weighs against a deliberate-indifference finding. *See, e.g.*, *Martin v. Hedgpeth*, No. C 12-3771 YGR (PR), 2014 WL 4756597, at *8 (N.D. Cal. Sept. 24, 2014) (5-day and 11-day delays for broken hand were not deliberate indifference, when plaintiff "had been prescribed ibuprofen and Tramadol for the pain").

On the other hand, courts within our Circuit have also held such delays created a triable issue of fact, especially when the delay caused lasting damage. *See, e.g.*, *Jett v. Penner*, 439 F.3d 1091, 1094-95, 1097 (9th Cir. 2006) (nearly 2-month wait for a doctor

10

and 19-month delay before seeing a hand specialist, as well as the complete failure to set and cast the inmate's badly-fractured thumb, during which it "healed improperly," created a triable issue on deliberate indifference); *Hunt v. Dental Dep't*, 865 F.2d 198, 200-01 (9th Cir. 1989) ("delay of more than three months" before offering dental care to repair plaintiff's "bleeding gums, breaking teeth and . . . inability to eat properly," resulting in "severe pain and . . . permanent damage to his teeth," created a triable issue on deliberate indifference); *Schafer v. Curry*, No. 08-1881 RMW (PR), 2009 WL 1562957, at *9 (N.D. Cal. June 3, 2009) (seven-day delay in treating broken foot); *cf. Broughton v. Cutter Labs.*, 622 F.2d 458, 459-60 (9th Cir. 1980) (six-day delay after hepatitis diagnosis with "no medical care" may or may not support deliberate-indifference claim, depending on additional facts; case remanded "with instructions that [plaintiff] be given an opportunity to amend his complaint").

Looking to the appellate courts outside the Ninth Circuit provides no clearer answer. *Compare, e.g.*, *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 778-79 (6th Cir. 2012) (collecting cases for the proposition that "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay" to succeed on a deliberate-indifference claim); *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006) (one-month delay in treating a broken finger not deliberate indifference); *with Smith v. Knox Cty. Jail*, 666 F.3d 1037 (7th Cir. 2012) ("[e]ven a few days' delay in addressing a severely painful but readily treatable condition suffices"); *Hunt v. Sandhir, M.D.*, 295 F. App'x 584, 586 (4th Cir. 2008) (nine-day delay coupled with other allegations of neglect concerning a broken elbow sufficient to state claim for deliberate indifference); *Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003) ("a few hours' delay in receiving medical care for emergency needs such as broken bones . . . may constitute deliberate indifference").

In sum, the courts have no "robust consensus" that the five-day delay here—which caused no lasting damage—so obviously violated the Constitution that the issue is "beyond

11

debate." *See Taylor*, 135 S. Ct. at 2044. Thus, Ortiz has qualified immunity and, like the other defendants, merits summary judgment.

## **CONCLUSION**

Woodson's complaint boils down to only one triable claim of deliberate indifference: that nurse Ortiz waited five days before treating him, though it caused no permanent damage. But she has qualified immunity on that claim. Thus, the Court recommends that defendants' motion for summary judgment be **GRANTED**.

Upon being served with a copy of this report, the parties have 14 days to file any objections to it. *See* 28 U.S.C. § 636(b)(1). Upon being served with any objections, the party receiving them has 14 days to file any response. *See* Fed. R. Civ. P. 72(b)(2).

Dated: January 21, 2018

_____
Hon. Andrew G. Schopler
United States Magistrate Judge